The Honorable the judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable the United States Court of Appeals for the Fourth Circuit are admonished to draw an eye and give their attention for the court is now sitting. God save the United States and this Honorable Court. Good morning everyone. Good morning. Good morning. Good morning. Ms. Atassi, you may proceed. May it please the Court. Sahar Atassi, Court-Appointed Counsel for Petitioner Trokon Diahn. I'd like to reserve five minutes for rebuttal. Yes. This case turns on a simple principle. The agency cannot create evidentiary gaps and then rely on those same gaps to deny relief. Particularly where a non-citizen is detained and unrepresented, an immigration judge has an affirmative duty to develop the record and ensure a meaningful opportunity to be heard. That duty was not met here. Mr. Diahn was a detained pro se 22-year-old when he was ordered removed to Liberia, a country he has never been to and where he faces grave risk of persecution without ever having a meaningful chance at a fair hearing. The government concedes critical notice defects in his proceedings and the IJ compounded those defects by excluding Mr. Diahn's evidence, failing to explain what he needed to prove or how to prove it, and failing to probe or elicit testimony about facts central to his claim. Despite those failures and after expressly finding Mr. Diahn credible, the IJ denied every form of relief for lack of corroboration based on the very deficiencies the agency itself created. That is precisely what the duty to develop the record forbids. The IJ then deepened those errors by misapplying key legal standards, including improperly applying the per se particularly serious crime bar to withholding relief, and the heightened hardship standard to his waiver of inadmissibility. The stakes for Mr. Diahn, who has been in the United States since age two, could not be higher. Remand is required so the agency can apply the correct standards on a fully developed record. Your Honors, unless you have questions, I'll begin with the statutory duty to develop the record argument, which we believe is the cleanest basis for remand. How is it also not totally unexhausted? Your Honor, in the BIA brief, the overarching theme is that Mr. Diahn did not understand what was expected of him and the IJ didn't help him. In Atom King, this court advised how it looks to substance over form and that when a claim is raised, in essence, that is enough and that magic words weren't required. Mr. Diahn, JA 328, explains how there were numerous indicators that he didn't understand what was expected of him, considering the lack of evidence submitted in support of his relief applications, incomplete forms, lack of country conditions, witness affidavits, witness testimony. He also states in the brief, it seems clear that either he did not understand his obligations to corroborate his applications or was unable to do so and that the IJ denied the relief based on that failure to corroborate. So exhaustion doesn't require precise legal labeling under this court's precedent and in Atom King in footnote 6, the court explains that any ambiguity... How isn't the BIA, I'm looking at and I've asked people to look again at, it seems pretty clear to me that in the BIA brief, what he's complaining about is the letters. Your Honor, he raises the letters, but it is about the... And it's not the IJ's responsibility to submit letters for him, so I don't know how that falls within the duty to develop the record. Your Honor, he was unable to submit his letters, the letters weren't accepted because he did not have proper notice. Okay, well then let me take you to that. I do not understand how anybody could hear what the IJ said and think that you can submit letters in October. I agree that the transcript is unclear if it's September 6th or September 26th. And so if the argument was like he submitted them on the 25th and they got bounced for being late, I think you'd have a great argument. I don't understand how anybody... I don't understand how there was any legitimate confusion that it wasn't October. Your Honor, I think there's two parts to this. First of all, he is pro se, he's detained, he has... In the transcript segment that you're referencing, the IJ does affirm kind of the three dates, and then he says you can have more time. He says you can have more time if you need it. Moreover, there's not a written notice that comes afterwards. The only notice in the record is for a hearing that ended up not happening on that date. It's not... Mr. DeYoung tried to comply as much as he could. He did not even have the address of where to submit these letters to and the other evidence to. He submitted it to the Baltimore Immigration Court. He says sometime in early October. That is one of the dates that the IJ did seem to confirm in the proceeding. There wasn't enough notice for... Confirmed for the proceeding, not confirmed for when you submit letters. I don't understand anything in the transcript that suggests letters can be submitted in October. Your Honor, he does seem to... There are three dates that he raises and the IJ does confirm all of them and then says it will give you more time. Moreover, even had he sent them by the later date, September 26th, he would have sent them to the Baltimore Immigration Court, the only court whose address that he has. It really isn't the proper notice for someone who's detained, someone who's pro se. It's a confusing transcript to be... A conversation. Can I ask you just another question about these letters? The government says this is harmless because they ended up... We ended up basically getting the information. I understand your argument in the reply brief to be the letters the government is pointing to are not the right letters that we're talking about. Is that a factual statement of what your argument is? That's correct. Then am I correct that the letters in question are literally nowhere in the administrative record at this point? That's correct. The letters were not... Which means because your client didn't submit them to the BIA either? They weren't submitted to the IJ, which could perhaps be explained by your client was not told when he needed to do it, but they weren't submitted to the BIA either. We're supposed to grant a PFR based on representations about what letters that the court literally can't see would have been prejudicial? Your Honor, the letters were not submitted with the BIA. Mr. Dionne did not have them after he sent them to the Baltimore Immigration Court, is my understanding. But the problem is that these letters did not make it into the record. They never made it into the record. It was lettered... Conduct a prejudice analysis of letters that the party that's urging error has never made part of the record, because how can I possibly assess that they're prejudicial if I don't know what they say? Your Honor, I think part of the problem, and this goes towards the duty to develop the record, is we don't have... The record doesn't exist, and it's not Mr. Dionne's fault here. The IJ had a duty to develop that record. The letters didn't make it in. His other corroborating evidence didn't make it in. He tried to comply as best as he could to get that evidence into the record, and he was... And that didn't happen. Counsel, let me ask you this, because I think it just... In following up to Judge Hyden's question, how... I mean, I'm not quite sure how we are to assess the issue of prejudice here if we don't have the evidence in the record. I mean, what if the written statements don't add anything else? I mean, I'm just a little concerned about how this court is supposed to be able to assess any prejudice with the exclusion of the evidence. Right. So on if the court does find that there is a duty... The IJ failed the duty to develop the record, the prejudice... It would be... That failure would be presumptively prejudicial, as this court has explained, that a non-citizen can't produce a record that doesn't exist. If the court were to analyze this as a due process failure, we would have to show, you know, a likelihood, a reasonable probability of a different outcome. We don't have the letters. We know that Mr. Dion sought to submit letters, sought to submit country condition reports and other documents, but he never had proper notice to submit those letters. The outcome could have been different if Mr. Dion had the proper notice, both of the hearing date, of where to mail these documents, of, you know, how to have witnesses support his claim. There's several issues, notice issues here, and the letters are just one piece of that. So is it your position that we can say there's this due process violation just based on the exclusion of the letters? It's not just the exclusion of the letters, Your Honor. So due process requires notice and an opportunity to be heard. Here, he had no notice of his hearing date. You know, he thought his hearing date was going to be on a different day. He had no written notice. He's in his jail cell. He's taken into, you know, to a different room to start his hearing that day. And then halfway through the hearing, he finds out the evidence that he thought, that he had mailed, that he had thought the BIA would have, or that the IJ would have, was not there and that the IJ would not be reviewing it. He also finds out partway, and he had mailed those letters to the only address he had ever been given by the court. He had never been given the Philadelphia Immigration Court's address. He had never been given a written notice that his case had been transferred. So he mailed these letters and his other evidence to the only court he had an address for. And then also partway through the hearing, he finds out that he could have had witnesses. He didn't understand he could have had witnesses to support his claims. And so there's, you know, had he been aware of all of these things, the outcome, there is a substantial likelihood, a reasonable probability of a different outcome in this case. So that is the due process violation here that we see. Ms. Itasi, go ahead, Judge Hyman. Go ahead. I was going to switch topics, Judge Gargay. Go ahead. Yeah. Yeah. Okay. This is on this one. Ms. Itasi, I think your argument is that really the due process is not based on the quantum or the weight of what might have been, but it's the fact that he did not have a chance to have those presented. It's like a person who's charged with a criminal case with just all kinds of evidence against them. But if they weren't told or weren't there available to hear it, no matter what their defense was to it, how meager it is or non-existent, the due process violation is the fact that they were not there to be considered one way or the other. And for instance, here, did they ever, the Baltimore office ever say, send these things to Philadelphia? So the I.J. says in that kind of confusing back and forth, send them to me, but now at the Philadelphia Immigration Court. He doesn't, which is unclear because up to that point he had been his I.J. before the Baltimore Immigration Court. He's never given the Philadelphia court address. And Judge Gregory, I agree with you. This is about looking about whether Mr. Dionne was able to submit his evidence at all and whether he had a fair opportunity to present his case. It's not about specifically whether the letters were sent to the right place or made it in on time. Right. Because he was detained the whole time, was he not? Correct. Correct. He was detained the whole time. So just to ask you, can I ask you a question with the inadmissibility waiver where I'm just having a really challenging time because so at a high level of generality, right, there's a standard that you have to meet in order to be eligible for it all. But then as I read the statute, as I read Gene, at the end of that process, the executive branch can also just say, yeah, you meet all of the requirements, but it's still going to be a no. Why? Because I decided it's going to be a no. Is that broadly jurisdiction to review? I know. That's just a framing question. Is that your understanding of how the statute works? It is, but that is balanced against a... Okay. So let me ask you, that was just the setup for the question I wanted to ask you. What if, I know this is not what the IJ said here, but what if what the IJ said here was something to the effect of, the IJ goes through the heightened waiver stuff and he concludes that your client fails that standard. The IJ says all that. But then what the IJ says after it is this, let's assume I was wrong about violent or dangerous, that it should have been the regular waiver standard. I would still think you fail under the regular waiver standard, so no. Would we have to affirm in that situation as harmless error? Sorry, if he was found to be not violent or dangerous and denied? No, no. The IJ first finds that he is and concludes that he's ineligible because he's violent or dangerous. But then the IJ, in the way that district judges sometimes say in federal sentencing, let's assume for the sake of argument that I'm totally wrong about everything I just said. Let's assume for the sake of argument that I don't think he's violent or dangerous. So I'm going to also, in the alternative, apply the regular standard he loses. Would that be harmless error in that situation? Because the IJ is essentially given two completely independent justifications for the same conclusion. Your Honor, I think part of it though, is it's after a finding of extraordinary... You know, I... But why? Why? If at the end of the day, the IJ can just say, who cares? Like, that's what I sort of read Matter of Gene. I mean, I guess I read Matter of Gene as saying two things. One, IJs, you're all way too quick to do this. That needs to stop. And the second thing that Matter of Gene pointedly says is, you could literally just, you could meet every single requirement and the attorney general might just decide the answer is still no. Right? I mean, that's correct under the statute, isn't it? I think IJs are allowed a wide range, a broad range of discretion. I think here the IJ misapplied the legal standard and raised... But then the IJ also said, but in the alternative, I do the same thing for another reason. So why isn't that harmless error? Because he weighs that same crime, the same offense again, and considering the positive and negative equities. So that legal... But why isn't he allowed to do that even under the regular standard? Because he framed it as a violent or dangerous offense. So he's weighing the violent or dangerous offense and another offense against his positive equities as well. Thank you. Thank you, Ms. Thompson. Mr. Alexander? May it please the court. There are several issues here and we can take them one at a time. Yeah. Okay. Let's start with the fact that this IJ orally told somebody his case had been transferred and he never got a written... What the heck is that? Well, Your Honor, that's not the best way to conduct business. Is that a legally permissible way to conduct business? Yes. To orally tell someone who is detained in pro se, this is going to be the only notice that we've transferred your case, is me telling you orally? So the significance of that is where to send the documents, right? That's the reason that it matters where the hearing is going to be conducted. Don't you think it's pretty important to tell a pro se incarcerated individual as clearly as we possibly can where he's going to send things and that maybe saying it to him on a Zoom call while he's in detention is a pretty lousy way of giving anybody, much less a pro se incarcerated person, notice if something is important to you. Where do you need to send the evidence that you hope to prevent, that you hope to use to prevent your removal from the United States? Well, the IJ said it quite clearly. It was quite clear in the transcript, send the materials to Philadelphia. Now, the interesting part of that exchange is that Mr. Dion was hung up on the due date and not on the where. Yeah, but don't you think that if the IJ told him to send it to Philadelphia, he should at some point, someone, the IJ should have said, where in Philadelphia? I mean, how does he, I mean, how? And I understand that the IJ is not there to give legal advice, but I think here that there, that he realizes the pro se non-citizen. I mean, to me, it seems as it would be appropriate to tell him where to send it. That would be better. No question, it would be better practice. But he gave him a clear instruction. Well, it wasn't clear because he didn't tell him where to send it. He gave him an instruction. I don't know if you can say it was clear because if he doesn't tell him where to send it, then I don't know if that's a clear instruction. Well, I understand your point, Your Honor. And again, this is not necessarily the best way to do business, but it is an acceptable way to do business. You know, the instruction was send it to Philadelphia and Mr. Dion never asked the question, well, where should I send it to? Again, he was hung up on the when and not the where. But Mr. Alexander, all the previous correspondence was contacted with Baltimore office, correct?  And that's the office he would have known the address to and had an understanding and a relationship in this sense of the litigation, if you will, or the question for the agency. That was all Baltimore. And you just say send it to Philadelphia and period. Where in Philadelphia? Send it down South Broad Street or West Philly or where? You say it's not the best practice, but is that any kind of way to deal with a serious matter like that being deported from the United States? And we know how great this country is and how many people have come here and helped make it great and continue to do it. And you say that's enough? Is that just by saying, well, that's a better way it could have been done. But is that the right way to do it when you're talking about due process? This is a legal situation here. Can you answer that? Because you seem to be, you know, kind of, I won't say cavalier, but you say, well, it could have been done better, but good enough for government work? What are you talking about? Well, Your Honor, the transcript is what it is. It seems to be deficient. It's deficient from a due process point, isn't it? Well, the other point is on all of these due process arguments is prejudice. So where is the prejudice? He sent, Mr. Dion sent the documents well later than they needed to be sent. So it didn't matter where he sent them to. They were late. Secondly, as the Court was discussing earlier, we don't know what was in that packet. So if we don't know what was in there, then we have no idea whether it's prejudicial to Mr. Dion or not that the material was never received. I think it's also an interesting point that there's discussion of, well, should the materials have been admitted? Should the immigration judge in his discretion admitted the materials? Well, there was nothing to admit. The materials were, they're not in the record. We don't know what they were. We don't know where they went. So, again, where is the prejudice? Well, did you look for the Baltimore office and call them up and say, I mean, not you personally, but the agency, and say, well, did you get any papers from someone by that name at all? You know, that's not in the record. I can't answer that. And so we have to assume that that wasn't done. Well, we could assume it was done. I don't think it would matter. No, I can assume it was done. No, we have to assume that it wasn't done because if it was done, if they found nothing, they would say, well, here in the record said there's nothing based on response from Baltimore. They never received any papers. So everything you say is against him, but nothing, the agency has no responsibility. Well, we have to assume that it was never sent. I don't see how you get that conclusion. Well, again, I'm not sure that it matters whether Baltimore got it or not, because the hearing was conducted on October 12th. The materials were not available on October 12th, and the judgment was rendered. That's a hearing that may have been so tainted with a lack of due process that, in a sense, from a legal standpoint, it's almost a nullity. And I think that's what we're here today to decide. So we'll decide, I guess, whether that matters or not. Right? And the question is, again, another way of saying that is was it a prejudice? Okay. I turn you to Kat Withholding because I don't know if I really understand the government's argument here. Yes. So you can see, just to make sure, again, this isn't intended as a gotcha. I'm just trying to make sure we're on the same page. You concede the IJ error in applying the particularly serious crime bar to that, right? To Withholding, correct. Okay. And so the argument that you make is that that's harmless error because he didn't challenge that, because the BIA sort of affirmed that. I read the BIA as affirming that on a mistaken waiver holding. I understand the BIA is rejecting that claim under the belief that he did not renew that claim before the BIA. And when I review his BIA briefs, I think that's just wrong. So what's your response to that? Well, that's not the way we read it, Your Honor. The way we see it is that he waived asylum. So the IJ made a – Right, but asylum and Kat Withholding are different legal standards, right? Oh, you're saying – I'm sorry, Your Honor. Kat Withholding, correct. I'm talking about Kat Withholding. Yes, correct. So I don't understand. I understand the BIA to say, well, he doesn't really – I don't read the BIA as affirming the IJ's decision on the merits. Sorry, Kat Withholding. Kat Withholding, yes. Okay. Kat Withholding. Yes. And I read the BIA as saying he doesn't challenge it, so it's waived, but I just think the BIA is wrong about that. What's your response to that? Well, as we say in the brief, Kat Withholding and Kat Deferral. So the IJ denied Kat Deferral on the merits. Right. He did not challenge that. So in his brief to the BIA, he waived the merits.  Of Kat.  Yes. So on Kat Withholding – Right, which he did challenge. He did challenge, and there was a mistake there. Okay. Our point is that it's not – it's harmless error because if the court were to remand to consider Kat Withholding, it would be a futile act because the merits decision on Kat Deferral necessarily applies to Kat Withholding. Through what? Operation of preclusion? Like what – I mean, as a predictive matter, maybe we know what the IJ is going to do, but I don't understand. Like on a preclusion theory, on a law of the case theory? No, no. It's based on the regs, where the regs discuss that it's essentially one set of facts, one claim. There's no distinction between the two in terms of the evidentiary standard, in terms of how they're evaluated. But if on remand the IJ were to say, I deny Kat Withholding for the same reasons I denied Kat Deferral, wouldn't he then be able to PFR that to the BIA and say that was wrong? I think that's correct, Your Honor. And as we said in our brief talking about a ping pong match where we're moving things around. And the BIA has never passed on the Kat merits at all. So how is it harmless error? In this world, he has an ability to challenge an issue before the BIA that the BIA has never passed on. I don't know how that would be harmless error. He had the opportunity to get the BIA to rule on the merits of the Kat denial and did not do so. So that's waived. I think I agree with you that it's waived on Kat Withholding. I don't understand how that's waived on Kat Deferral, which he did try to challenge for the BIA, as I understand. We agree with you on that point. And again, our point is you send the thing back down. Yeah, I know what the IJ is going to say, but the difference now is that he has an appeal to the BIA that he could take. Well. And he could say, I think the IJ was wrong. Wrong on what? Whether Kat Deferral, which I guess necessarily would encompass the BIA being wrong about, sorry, the IJ being wrong about Kat Deferral. I'm sorry, I'm confusing Withholding. Yes, I understand he couldn't re-raise the thing he never raised before, but he would still be able to raise the thing he's still raising. Right? Correct. And our point is the ruling would be the same. Necessarily because the merits are the same. Does the BIA always affirm IJ decisions? No, of course not. Do courts always uphold BIA decisions? No. We're hoping the court will uphold the BIA decision here. So I guess I take your point that I think I know full well what the IJ is almost certainly going to do, but I guess I don't know what the BIA is going to do on a question the BIA has never passed on. And I certainly don't know what this court would do if it was asked to pass on a question that it's never been asked to pass on. Well, again, our position is the BIA has never passed on that question because it was waived. And I understand your point of the legal argument on Kat Withholding. But, again, Kat Deferral and Kat Withholding, same standard of evidence. You're going to get the same decision. To us, remand is futile. Well, how about another? Could I take you to the inadmissibility waiver? Sure. I don't really understand how that would possibly be. Even assuming for the sake of argument that you're right about how these two parts of the analysis fit together, why wouldn't this be harmless error rather than lack of jurisdiction? Well, it's two separate arguments. You know, the first argument is because the decision was made as a matter of discretion, there's your lack of jurisdiction. Well, no. As I read, what was made was an in the alternative decision based on lack of jurisdiction. But I understand the decision to be you're ineligible. Correct. The decision was you are ineligible. And as an alternative, we would deny it anyway as a matter of discretion. Right. And so I guess before we get into whether that works or not here, that strikes me as much more harmless error-y than lack of jurisdiction. Well, that's our second argument. Our first argument is there's no jurisdiction. It was a matter of discretion. Therefore, the court cannot review it. In the alternative, if the court does review it, then it's harmless error. Can you ask? I'm trying to understand this. So I understand the IJ concluded that the heightened standard did apply. And I think I understand how the analysis goes there. Can you walk? It's really actually pretty unclear to me. Say for the sake of argument, again, you're not going to concede anything by positing this for purposes of this question. Say counterfactually, the IJ concluded the heightened standard didn't apply. How does the analysis work then? And I'm not even looking for your argument for why he'd still lose. I'm literally just trying to figure out what questions would the IJ ask? If the IJ had concluded the heightened standard didn't apply, what is like the decision tree the IJ would then go through? Because I'm just trying to make sure I understand that. Well, then I think you have to go through the exceptional and extraordinary hardship analysis. So can he show that the hardship that he and his family would suffer is beyond the normal scenario in a removal setting? So it'd be a different legal analysis. The reason that it matters whether or not the heightened standard applies is because what the IJ is supposed to do next depends on whether that standard applies. It affects everything the IJ does after that. I believe that's correct. Okay. And would the IJ then, under sort of practice or under regs or under the AG opinion, could an IJ just say, you know what, I'm not going to do any of that analysis. Who cares? Because I'm going to skip to the end and tell you that whether the heightened standard applies or not, whether or not he can show exceptional hardship or not, I'm just not giving this guy an admissibility waiver. As a descriptive matter, do IJs ever do that? And as a matter of practice, could an IJ do that? I can't answer whether they do or not. There's a lot of IJs out there. Have you seen an example where an IJ ever did that? I personally have not. Okay. And it's not an issue that comes up all that often, Your Honor. I've been in this office for 18 years, and I've never seen it. Does that mean it doesn't happen? I can't say. So what IJs, as a practical matter, always do is they decide whether the heightened standard applies, they then apply the standard that they think should apply, and they get to this discretionary issue if and only if they get through the other parts of the analysis? Descriptively, based on what you're saying? As far as I know, that's correct. Okay.  If the Court doesn't have any more questions, we submit that the Court should affirm the decision of the Board of Immigration Appeals. Decisions. Thank you, Mr. Alexander. Pass it. Your Honors, on the prejudice issue that Mr. Alexander raised, the letters were a part of it, but it wasn't just that. He was credible, and he lacked corroboration, and that's why his claims were all denied. If he had witnesses, the letters, the other evidence he sought to admit, that would have established prejudice. And as to what the IJ could have done, he could have done what IJs do every day. He could have continued the hearing. He could have kept the record open. There are many things the IJ could have done, particularly here where it's a pro se detained noncitizen who had recently had his case transferred, didn't have written notice of it, didn't know where to mail his evidence. That would have been a routine thing to do, something that the IJ should have done. As for the particularly serious crime bar— What do I do about your client's testimony, his explanation of, I didn't want people to know my business? Let me posit that I completely understand why he might feel that way, but it sort of undercuts the IJ's failure to develop the record. If your own client says, why didn't you contact people? It's like, well, because I didn't want people to know things about me that are admittedly, again, highly sensitive. I'm not faulting him for feeling that way, but I'm not really sure how that squares the rest of your argument. So there he was specifically talking about his romantic partners. And in the next, I think even on the same page or maybe within the next couple pages, he says that if he knew he could bring witnesses or if witnesses would help him, he'd have them. I think that part is specifically speaking towards romantic partners because he says he wanted to keep it family-based or he didn't want everyone knowing his business. So I think that is just talking about partners. The other piece, though, is if he would have understood that corroboration, that this rested on corroboration, he could have better done a cost-benefit analysis of, is it worth telling romantic partners about this? Is it not? He really didn't understand what he was supposed to be establishing, that he could have witnesses. So there's several components that he, you know, that could have been a different decision either way. So here, just kind of in summary, the stakes are too high to let this stand as is. He came to the United States at age two as a refugee. He's been here his entire life. He's never been to Liberia. Based on his identity, he faces severe hardship if he were to be removed there. This case was confusing in every respect. There were conflicting addresses, shifting deadlines, no notice of the hearing date, no address for where to send his evidence, no adequate explanation of what evidence was needed, how to present it, no explanation of how to present witnesses in a remote hearing. Despite that confusion, Mr. Dion tried throughout. He mailed evidence to the address he was given. He testified at his hearing. He sought to reopen his proceedings when he realized the record was incomplete. He has attempted to comply throughout. During the merits hearing, the IJ found him credible, denied relief based off of this lack of corroboration. The corroboration is the agency's own failure that prevented, which prevented him from providing the corroboration. The evidentiary gap was what prejudiced this case. The stakes are too high to deny him the opportunity to present this case on a fully developed record. The court should vacate the removal and remand so the agency can adjudicate his claims properly, with proper notice, correct legal standards on a complete record. If there's no more questions, your honors. Mr. Tassi, I note that you're a court opponent. I want to give you a special thanks on behalf of the Fourth Circuit. We depend on lawyers like yourself to handle these cases, and we appreciate your very able representation. Mr. Alexander, your representation of the Attorney General of the United States. With that, we can't come down in our normal fashion to greet you in handshakes. But nonetheless, it's just as hearty and authentic virtually. Appreciate it. And be safe in this weather. Take care. Thank you, your honor. Thank you. All right. Bye-bye.
judges: Roger L. Gregory, Toby J. Heytens, DeAndrea Gist Benjamin